**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARY C. FONTAINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 8738 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

Mary Fontaine was a partner at the law firm of Mayer Brown in Chicago, where she practiced in the firm's structured finance group for thirty years. As a benefit of her employment, Fontaine had an opportunity to purchase two insurance policies through Defendant Metropolitan Life Insurance Company ("MetLife"): a long-term disability policy and an individual disability policy. The policies entitled Fontaine to receive monthly benefit payments should she become disabled.

In 1997, Fontaine began having problems with her vision. She complained of seeing floaters and flashes in her eyes, and she had trouble focusing. Her doctors diagnosed her with myopic macular degeneration, a condition that results in a loss of vision in the center of the visual field. Over the next several years, Fontaine's condition deteriorated, and in 2011, she decided that her vision had become so impaired that she could no longer perform her material job duties. She filed a claim for disability benefits with MetLife, but MetLife denied her claim, finding that she was not disabled under the policies.

Fontaine now brings this suit challenging MetLife's denial of her claim under Section 502(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 ("ERISA").

The parties have filed cross-motions for entry of judgment and request a trial on the papers in accordance with Federal Rule of Civil Procedure 52. Because the court finds that Fontaine has proven by a preponderance of the evidence that her disability left her unable to perform any of her material job duties as a structured finance partner, the court grants Fontaine's motion for entry of judgment and denies MetLife's motion.

## I. FACTS

### A. The Disability Insurance Polices

Fontaine seeks benefits under two policies she had with MetLife: a long-term disability policy and an individual disability policy. In denying Fontaine's disability claim, MetLife found that Fontaine did not meet either policy's definition of "disabled."

The long-term disability policy defined "disabled" as follows:

**Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury:

- You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and

- You are unable to earn:

  - more than 80% of Your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy; and

  - unable to perform each of the material duties of Your Own Occupation.

(Compl. Ex. A (LTD Policy) 22.) The policy defined "Own Occupation" as "the specialty in the practice of law in which You were practicing just prior to the date Disability started." (*Id.* at 23.)

The individual disability policy provided coverage only if an employee became "totally disabled," which the policy defined as follows:

**Total Disability** or **Totally Disabled** means that due solely to impairment caused by Injury or Sickness, You are . . .

  a.  Prevented from performing the material and substantial duties of Your Regular Occupation;

        b.      Not Gainfully Employed; and

        c.      Receiving appropriate care from a Physician who is appropriate to treat the condition causing the Impairment.

(Compl. Ex. B (IDI Policy) 7.)  The policy defined "Regular Occupation" as, "Your usual occupation (or occupations, if more than one) in which You are Gainfully Employed at the time You become Disabled."  (*Id.*)

## B. Fontaine's Claim

On May 3, 2011, Fontaine filed a claim for disability benefits with MetLife.  In support of her claim, Fontaine provided her medical records, a list of her treating physicians, and a nine-page employee statement explaining why she believed that her eye disease prevented her from performing the material duties of her job.

In the employee statement, Fontaine described the nature of her work as a structured finance partner.  She stated that she "designed, documented, negotiated and closed complex financial transactions (including securitizations, CLOs and derivatives) that were funded in global capital markets."  (MET 931.)[1]  She stated that the structured finance partner's role in these transactions was to "break portfolios of financial assets and related risks into different categories and to allocate[e] each category of risk, as well as cash flow from the financial assets, among a number of different parties."  (MET 932.)  She described her practice as "requir[ing] the ability to master and manipulate large concepts and simultaneously insure the accuracy of minute detail spread across thousands of pages of interlocking contracts."  (MET 931.)  She noted that a typical contract went through several rounds of revision, and, as the lead partner on a transaction, she was ultimately responsible for making sure that the final draft incorporated all of the

---

[1]      References to "MET ____" and "PLA ____" are to the corresponding Bates-numbered page of the administrative record.

comments from the various parties. She noted that "[h]undreds of millions, or even billions, of dollars change hands in these transactions" and that "[t]here is no margin for error." (MET 931.)

Fontaine described her typical day, which she said began at 6:15 when she woke up to catch the 7:16 train downtown. She stated that, while she was on the train, she would read and respond to Blackberry messages that came in overnight. She arrived at the office around 8:00 a.m. She stated that, throughout the day, she would draft and edit documents, read laws and regulations relevant to her transactions, field written and telephone questions from clients and associates, work through term sheets and diagrams for potential new transactions, and participate in business development activities. She stated that she would read and respond to between 150 and 300 emails per day. She would leave the office between 8:00 p.m. and 1:00 a.m, and she regularly worked during the weekend. In addition to her typical working days, she traveled to other cities several times per year to make client pitches and attend conferences.

Fontaine listed several reasons why her eye disease prevented her from doing her job. She stated that she had difficulty "reading and digesting complex cash flow formulas that go on for pages and often involve footnotes in tiny type," "reading numbers and accurately noting where the decimal point is placed," and "discerning the subtle differences between similar contract provisions during contract negotiations conducted in concentrated time frames." (MET 931.) She stated that she could not "generate timely issue summaries for clients, or lead them through a line-by-line review of lengthy contracts." (MET 931.) She could not correct the work of attorneys whom she supervised and "misplaced words in documents in a way that change[d] the[ir] legal meaning." (MET 938.) She stated that she could not "read fast enough to get through the volume of work on [her] desk each day." (MET 938.) She stated that she could "no longer effectively generate new business" because she could not read materials to prepare for

meetings with a potential client and had difficulty reading name tags and business cards.  (MET 938.)

Fontaine concluded by noting that, while she had not yet made a mistake that was catastrophic to one of her clients, she did not believe she could "justify subjecting my clients or my firm to the risk that I will make such a mistake."  (MET 939.)

## C.  Fontaine's Medical History

In 1997, Fontaine began seeing various doctors for problems she was having with her vision.  On June 10, 1997, she saw Dr. Jack Cohen, a vitreoretinal specialist.  Dr. Cohen noted that Fontaine complained of a "distortion that would float" and "flashes" in her left eye.  (MET 1297.)  He noted that his initial diagnostic impression was that Fontaine had "[b]ilateral pathological myopia" and "lacquer cracks."[2]  Dr. Chang-Bok Lee took photographs of Fontaine's eyes and noted that his initial diagnostic impression was that Fontaine had "[m]yopic retinal degeneration" in both eyes.  (MET 1361.)

On August 8, 2005, Fontaine visited Dr. Cohen, complaining that she had experienced floaters and difficulty focusing.  He noted that she was having migraine headaches.  His initial diagnostic impression was of myopic degeneration and posterior vitreous detachment in Fontaine's left eye.

On April 11, 2006, Fontaine was evaluated by her ophthalmologist, Dr. Robert Stein.  Dr. Stein noted that "fundus observation showed minimal myopic degeneration of both retinas" and that Fontaine "enjoys excellent visual health."  (MET 1033.)  At a later visit on August 26, 2008,

---

[2]       "Myopia" is a condition in which only rays from a finite distance from the eye focus on the retina.  It is commonly known as nearsightedness.  "Pathological myopia," or "degenerative myopia," is "progressive myopia marked by fundus changes, posterior staphyloma, and subnormal corrected acuity."  The "fundus" is the part of the eye opposite the pupil.  A staphyloma is a bulging of the cornea or sclera containing uveal (i.e., vascular) tissue.  "Lacquer cracks" are tears in lymph nodes in the eye.  STEDMAN'S MEDICAL DICTIONARY, 27th Ed.

Dr. Stein noted that Fontaine had "atrophic myopic [degeneration]," which was more severe in her left eye. (MET 1012.)

On April 21, 2009, Fontaine returned to Dr. Cohen, complaining that straight lines appeared to "wave or twist." (MET 1291.) The next day, Dr. Cohen wrote a letter to Dr. Stein, noting that Fontaine visited his office complaining of distortions in her left eye. Dr. Cohen wrote that Fontaine had a "long history of myopic degeneration" and that "[u]nfortunately, there is no cure for this situation." (MET 1306.) Fontaine returned to Dr. Cohen again on July 14, 2009, complaining of a sudden decrease in visual acuity (*i.e.*, clearness of vision) in her left eye.[3] (MET 1274.) She was evaluated by Dr. Cohen's colleague, Dr. Zac Ravage, a vitreoretinal specialist, who measured Fontaine's corrected visual acuity as 20/200 in her left eye and 20/25 in her right eye. (MET 1274.) Dr. Ravage diagnosed Fontaine with myopic degeneration. He injected Fontaine's eye with a drug called Avastin and advised her to return in one month for a follow-up. At the follow-up, Fontaine's visual acuity in her left eye had improved to 20/60 as a result of the Avastin injection.

At a January 14, 2011, appointment with Dr. Ravage, Fontaine complained of worsening depth perception and that she had hit her head while getting into a cab. Dr. Ravage noted that Fontaine's worsening vision may have been due to the progression of a cataract (a clouding of the lens) in her left eye. On February 7, 2011, Fontaine saw an optometrist, Dr. Alan Karikomi. Dr. Karikomi's notes indicate that Fontaine's "complaint was seeing double at [a] distance with street signs, driving, and movies. She was not having any problems at work and there was a

---

[3]     "Visual acuity" is a measure of a person's clearness of vision. It is often measured using an eye chart and is represented by two numbers. The first number represents the distance between the person and they eye chart (20 feet). The second number represents the distance at which the smallest line on the eye chart "subtends an angle of 5 arcminutes." If the smallest line on the eye chart subtends 5 minutes of arc when a person stands 20 feet away from the chart, then the person has "20/20" vision. STEDMAN'S MEDICAL DICTIONARY, 27th Ed.

slight halo effect with her distance vision." (MET 656.) Dr. Karikomi increased the strength of Fontaine's contact lenses to -22.0 in the left eye and -7.50 in the right eye.

On March 22, 2011, Fontaine returned to Dr. Stein. At this visit, she told Dr. Stein that her depth perception was off and that she had fallen down in the elevator that day. She noted that her visual acuity would go in and out of focus, objects appeared "crinkled," and she had noticed some floaters in her eye. (MET 1303.) Dr. Stein noted that Fontaine was having trouble multitasking at work "due to multiple mediums" and that she was "[c]onsidering retirement due to disability." (MET 1303.)

## D. Dr. Stein's Attending Physician Statement and Dr. Nelson's Review

In addition to her medical records, Fontaine also submitted an attending physician statement in support of her disability claim. Dr. Stein completed the statement. He indicated that he had diagnosed Fontaine with myopic macular degeneration.[4] (MET 01359.) He listed Fontaine's symptoms as "blurred vision – progressive." (MET 01359.) He wrote that no treatment was available and that he advised her to cease her occupation because of her worsening condition.

MetLife asked Dr. Robert Nelson to review Fontaine's medical records, her nine-page employee statement, and Dr. Stein's attending physician statement. Dr. Nelson prepared three reports for MetLife. In his first report, dated July 13, 2011, Dr. Nelson noted that the visual function of Fontaine's right eye appeared to be within normal limits when she used contact lenses. He noted that Dr. Karikomi had been able to correct Fontaine's acuity in her left eye to

---

[4] "Macular degeneration" is a "loss of central vision . . . produced by pathological changes in the macula lutea [a small area lying slightly lateral to the center of the retina] and characterized by spots of pigmentation or other abnormalities." WEBSTER'S MEDICAL DESK DICTIONARY at 403 (1986).

nearly 20/25 in May of 2011.  He noted that successful cataract surgery would bring about more stabilization of the visual acuity in the left eye.  He added,

> I might also suggest that anxiety, stress, maybe even some degree of "burn out" may contribute to her apparent insecurity in her employment position presently. In her physician listing, she noted that she has seen both a psychologist and psychiatrist recently.  I would conclude definitively, that her present visual status should in no way affect her ability to generate new business or "make rain."

(MET 00907.)

On September 26, 2011, Dr. Nelson issued a second report, based on additional documents provided by MetLife.  He noted that Fontaine's best corrected visual acuity was now 20/40 at distance in her left eye.  He noted that when both eyes worked together, her corrected visual acuity was 20/20 – 20/25. He concluded,

> [A]fter review of extensive documents provided, I do not feel that the objective evidence supports a visual basis for [Fontaine's] concerns.  It is my opinion that her present visual capabilities would permit her to utilize a computer, read, drive an automobile, and perform the employment requirements that she has described competently and capably.

(MET 776.)

Fontaine's ophthalmologist, Dr. Stein, reviewed Dr. Nelson's reports.  On October 7, 2011, he wrote a letter to MetLife in which he disagreed with Dr. Nelson's conclusion that Fontaine could perform the requirements of her job because of her good visual acuity.  He stated,

> While corrective lenses can provide baseline visual function for simple, brief tasks such as reading an eye chart, they do not provide adequate visual function for the unique demands of Mrs. Fontaine's job, specifically as those demands relate both to the quantity of reading Ms. Fontaine has to perform each work day, as well as the number of hours each day that Ms. Fontaine has to maintain visual function at an exceptionally high level. . . . Mrs. Fontaine's vision is impaired by a combination of conditions, including myopic macular degeneration; and she also experiences floaters that also interfere with her ability to continuously read documentation.  I believe that that these conditions have progressed to a point where she is no longer able to meet and maintain her critical work requirements over the course of a work day and work week.

(MET 709.)

Fontaine's optometrist, Dr. Karikomi, also wrote a letter to MetLife disagreeing with the emphasis that Dr. Nelson placed on Fontaine's good visual acuity:

> Dr. Nelson suggests that a different prescription, or a different combination of contacts and glasses, would significantly improve Mrs. Fontaine's vision. I would like to assure you that during the 14 years that Mrs. Fontaine has been my patient, we have tried many different prescriptions and combinations of contact lenses and glasses. These efforts have intensified as her vision has continued to deteriorate. In my opinion, which is based on my lengthy, regular and in-person experience with this patient, the current combination of contact lenses and reading glasses provides the best functional vision that can be achieved in Mrs. Fontaine's case. . . .

> Dr. Nelson also implies that with both eyes, Mrs. Fontaine's vision achieves 20/20. This is true, but it does gloss over the fact that, when the two eyes are not in sync, due to the inability of the left eye to contribute fully and equally, the visual task is a lot like running with one stunted or disabled leg. . . . The likely result is often . . . [a] loss of place in a line or a paragraph, blurry and fluctuating vision, double vision, or at the very least, visual confusion leading to headache. . . . [R]eading is no longer a simple task just because the better eye has 20/20 vision.

(MET 711.)

On November 3, 2011, Dr. Nelson authored a third report for MetLife, in which he responded to the letters from Drs. Stein and Karikomi. Dr. Nelson stated that he did not dispute that Mrs. Fontaine "is experiencing difficulty maintaining the high pace of work required in her employment capacity," but he maintained his view that Fontaine's vision was "[not] the underlying problem." (MET 601.) He further stated that he did not agree with the analogy that Fontaine's vision was like running with one stunted leg, noting, "It is my opinion that if one eye is normal and the other slightly less than normal, that the latter would function as a 'helper eye' rather than provoking visual confusion." (MET 601.) Dr. Nelson stood by his previous conclusion that Ms. Fontaine's visual capabilities would permit her to complete her employment requirements. (MET 600.)

## E. MetLife's Field Report

MetLife field representative Randy Guillen surveilled Fontaine's home from July 5, 2011, to July 7, 2011, and met with Fontaine and her attorney on August 1, 2011. Guillen prepared a field report for MetLife based on his conversation with Fontaine. Fontaine told Guillen that she noticed her vision had worsened in the fall of 2010. She said that she had myopic macular degeneration, which affects the retina in her eyes by stretching it to the point where it tears and cracks. She said that she saw floaters and her central vision was blurred. She said that when she looked at letters and numbers, it appeared as though there were slants in them. She said that her inability to see threw off her balance and that she was unsteady on her feet.

Guillen asked Fontaine about the fact that she was seeing a psychiatrist and a psychologist. She told him that she saw the psychiatrist and psychologist for family matters only, such as when her father passed away. She said that she enjoyed going to work, that it made her feel powerful and respected. She said that she was well-known at the firm for having high-energy and that she could work longer hours than the associates who were in their 30s.

Guillen asked Fontaine about her job duties, and she reiterated many of the same details that she included in her employee statement. She said that attorneys and clients send her documents at a rapid pace and she has to focus and read them extremely quickly. She said that she had to review contracts, documents, and emails on computer screens and paper all day every day. She said that she was unable to see comments sent to her in "track changes." With respect to why she decided to leave, Guillen reported,

> She had been making excuses to herself for a long time, and the decision to file a claim was an extremely difficult one. She began making mistakes more often . . . .
>
> Her whole identity is tied to her occupation. She is nationally recognized as an expert in her field and is the highest paid female partner in her firm. . . . Her clients are used to her working at a certain pace, and if she could keep working,

she would, but she realizes she just can't keep up anymore. Giving up on her
occupation and her identity is heartbreaking, as she loved what she did and felt
very powerful. Her firm moved the economy, and it was exciting for her to work.
She has come to the realization that she cannot do what she did any longer.

(MET 623.)

## F. MetLife's Denial of Fontaine's Claim and Fontaine's Appeal

On November 10, 2011, MetLife denied Fontaine's claim for disability benefits. MetLife

concluded that the medical information Fontaine provided did "not support any restrictions or

limitations that would prevent her from performing her occupation." (MET 560.)

On March 1, 2011, Fontaine appealed MetLife's denial of her claim. In support of her

appeal, she attached (i) a letter and medical records from Dr. John Michael, a vitreoretinal

specialist; (ii) a letter from an optometrist, Dr. Michael Zost; (iii) a letter from an occupational

rehabilitation specialist, James Boyd; and (iv) letters from the chairman of Mayer Brown,

Herbert Krueger, the head of the structured finance group at Mayer Brown, Jon Van Gorp, and

Fontaine's psychiatrist, Dr. Henry Conroe.

### 1. Dr. Michael

Dr. Michael reviewed Dr. Stein's assessment and examined Fontaine on December 13,

2011. He noted that Fontaine "had definite vitreous floaters with posterior vitreous detachment."

(MET 461.) He noted the existence of "some lacquer cracks consistent with myopic

degeneration. (MET 461.) Based on his review of Dr. Stein's assessment and his own

examination, he concluded,

I agree with [Dr. Stein's] findings on the difficulty that Mrs. Fontaine experiences
during reading. I would only add that, in addition to Dr. Stein's comments, . . .
the extent of Ms. Fontaine's visual difficulties cannot be fully elicited with
[traditional] visual acuity [tests]. Because of the lacquer cracks and degeneration
in the macula, there are patches of the retina that may seem better than others. To
some extent, her vision may be more closely described as sort of a Swiss cheese
where certain letters may disappear and appear as she scans reading material.
This can make prolonged reading more difficult.

(MET 463.)

## 2. Dr. Zost

Dr. Zost had Fontaine take the Test of Word Reading Efficiency, Second Edition ("TOWRE-2"). The test consists of reading as many words as quickly as possible in 45 seconds. The test starts with elementary words such as "is," "up," "cat," "red," and "book," and eventually moves to multisyllabic words such as "valentine," "prairie," "recently," and "detective." A person's score on the test is based on the total number of correctly pronounced words.

Dr. Zost stated that he administered two rounds of the test back-to-back to determine whether Fontaine did worse after the first test. Fontaine performed in the 35th-39th percentile in reading efficiency in the first round. She performed in the 27th percentile for reading efficiency in the second round. Based on these results, Dr. Zost concluded that "Fontaine's efficiency decreases with prolonged exposure to reading[,] implying fatigue and loss of stamina." (MET 450.)

Dr. Zost also administered a visual field test, which he said confirmed that Fontaine had central relative scotomas consistent with macular degeneration.[5] He reviewed an optical coherence tomography ("OCT") scan of the posterior pole of each eye performed by Dr. Michael. He summarized his conclusions as follows:

> Mrs. Fontaine's visual abilities[,] including reading efficiency, consistency, and stamina[,] have been affected by the progressive nature of her myop[i]a. I can best equate her vision to trying to read or see something while looking through a piece of Swiss cheese. Sometimes she may find a "sweet spot" in her vision to allow her to see a word o[r] figure or part of a sentence or group of numbers, but then the word or figures immediately following may be missing or blurred or distorted. Her vision can fluctuate due to this pattern. This can negatively impact

---

[5] A "scotoma" is an isolated area within the visual field in which vision is absent or depressed. An "absolute scotoma" is a scotoma in which there is no perception of light. A "relative scotoma" is a scotoma in which there is a visual depression but not a complete loss of light perception. STEDMAN'S MEDICAL DICTIONARY, 27th Ed.

visual tracking which is essential for efficient reading. She can easily lose her place, [and] skip words or key information required for accurate comprehension.

(MET 00451.)

### 3. <u>James Boyd</u>

James Boyd had Fontaine take four vocational tests. He administered a standardized reading test and several clerical tests, which he said were typically used to test a person's ability to work with the numerical data, charts, and graphs that Fontaine encountered at work. Mr. Boyd found that Fontaine performed significantly below average on each of these tests. For example, she scored in the 35th percentile on a reading comprehension test, and in the 1st-5th percentile on a clerical test.

Based on these results, Mr. Boyd concluded that the "[v]ocational testing results clearly illustrate and confirm deficits that directly impact Ms. Fontaine's ability to perform the material and substantial duties of her regular occupation as a Structured Finance Partner." (MET 442.) He identified four requirements (or "temperaments") of Fontaine's job that he believed she would be unable to perform: (i) "attaining precise limits, tolerances, and standards"; (ii) "performing a variety of duties without loss of efficiency"; (iii) "reaching data-based conclusions"; and (iv) "performing effectively under stress." (MET 441-42.) He concluded,

Ms. Fontaine's error rate in testing would negatively impact the "qualitative" aspects of her job and jeopardize the exacting nature of her work. Her consistently slow production speed falls well below an acceptable competitive standard and would negatively affect the "quantitative" aspects of her job. . . . [I]t is my opinion that Ms. Fontaine meets the definition of "total disability" as defined in the MetLife policy language . . . .

(MET 442.)

### 4. <u>Herbert Krueger, Jon Van Gorp, and Dr. Henry Conroe.</u>

Mayer Brown chairman Herbert Krueger stated that Fontaine was one of Mayer Brown's most highly respected and hardest working partners; only nine partners in the firm received

higher bonuses from 2008 to 2010. The head of the structured finance group, Jon Von Gorp, stated, "For her entire career Mary has met and usually exceeded the difficult demands of her clients." (MET 481.) He added, "Although she is willing and motivated in every way, Mary's impaired eyesight is now a true impediment to her performing her job as a senior partner at the level that her clients expect, that she expects and that our practice and that our firm expect." (MET 481.) Dr. Conroe, Fontaine's psychiatrist, noted that he had seen "no indication that [Fontaine] ha[d] ceased working" because of burn out, and that "she has expressed pride in her success as an attorney and satisfaction in the work that she has been doing." (MET 480.)

## G. MetLife's Consideration of Fontaine's Appeal

In considering Fontaine's appeal, MetLife consulted four individuals: (i) Dr. Clayton Hauser, a family practitioner; (ii) Dr. Dean Eliott, an ophthalmologist with the Massachusetts Eye & Ear Infirmary at Harvard Medical School; (iii) Dr. Bruce Anderson, a fellow of the American Board of Optometry and an Assistant Professor of Opthalmology at the University of South Florida College of Medicine; and (iv) Dr. Francine Michel, a vocational expert.

### 1. Dr. Hauser

Dr. Hauser reviewed the administrative record and commented on Fontaine's doctors' findings. He criticized Dr. Zost's use of the TOWRE-2 test, stating that his use of the test to show that Fontaine became fatigued after reading for a period of time was "a grossly inappropriate use of the test." (MET 396.) He wrote, "The notion that she read a list of words for 45 seconds and would then experience fatigue in reading another list of words for 45 seconds is nothing less than ridiculous." (MET 396.) Based on his review of the administrative record, he concluded,

> Ms. Fontaine has had myopic macular degeneration for several years.
> Fortunately, her vision has remained stable. Her visual acuity has had minimal

fluctuations, but remains essentially unchanged. The testing done by her physicians has no validity testing built into the tests to assure full patient effort and cooperation. The best assessment of her visual acuity is her job performance. For 2008 through 2010 her performance has apparently been stellar. Since 2010 there has been no significant change in her vision. Her medical condition is one that could have progressed, but if it did, I would expect to see a parallel decline in her productivity. Based on the letter from Mr. Krueger, this has obviously not been the case. I would not expect her to be able to perform at a high level one day and not be able to perform her job at all the next day, unless she suffered a catastrophic change in her condition. Since her medical condition has not changed significantly, there is no medical basis for her to be unable to continue performing the work she has done over the years.

(MET 397.)

### 2. **Dr. Eliott**

Dr. Eliott also reviewed Fontaine's medical records and occupational information for MetLife and prepared a report. Based on the record, Dr. Eliott concluded,

> [T]he patient has mild cataract and myopic macular degeneration consisting of macular pigment changes and lacquer cracks in both eyes and a regressed choroidal neovascular membrane in the left eye. Her visual acuity has been relatively stable and is mildly reduced (slightly worse than 20/20). As a result, she may have some difficulty seeing very small font. Visual acuity is only one measure of visual function. Since the patient has lacquer cracks and pigment changes (as well as a regressed choroidal neovascular membrane), she likely has a few small scotomas (blind spots) within her macula which may result in some difficulty with reading such as reduced reading speed.

(MET 324.) In response to the question, "Was there a significant change in Ms. Fontaine's medical condition around May 1, 2011?" Dr. Eliot wrote, "There does not appear to be a significant change around [May 1, 2011]." (MET 324, 361.) In response to the question, "Is there an ophthalmological explanation for [Fontaine's] inability to continue to work in 2011?" he wrote,

> From 2008 through 2010, Ms. Fontaine was able to perform her job. In fact, she presumably functioned at a very high level since she received one of the highest bonuses in the firm. For the 3-year period, only 9 out of 400 partners received a higher bonus. Over time, she likely developed some reduction in reading speed as noted above. This may impact her job performance due to the high visual need required for her job.

(MET 325, 261.)

### 3. Dr. Anderson

Dr. Anderson also reviewed the administrative record for MetLife. With respect to Fontaine's doctors' conclusion that her vision was like "looking through a piece of Swiss Cheese," Dr. Anderson opined that the "visual field data analysis is not consistent" with that conclusion. (MET 203.) He reviewed the visual field test that Dr. Zost performed on Fontaine's right eye and noted that the "pattern standard deviation" of that test was "1.01 dB." (MET 203.) Dr. Anderson opined that this indicated "minimal variation or visual change in the central visual field." (MET 203.) He noted, "The pattern deviation is essentially normal with one spot of depression. The depressed area is a single test spot of decreased sensitivity (4 db). This does not indicate an absolute scotoma, but maps a region of slightly decreased light perception." (MET 204.) He noted that he saw no evidence of absolute scotomas in Fontaine's right eye.

Dr. Anderson noted that a person typically needs to have visual acuity in the 20/50 to 20/500 range to read fluently. Because Fontaine's visual acuity was no worse than 20/60, he concluded that "the level of acuity required to read fluently is easily met." (MET 204.) He concluded that "the claimed visual loss and problems with reading is not supported by the clinical data." (MET 204.)

### 4. Dr. Michel

Dr. Michel reviewed Mr. Boyd's vocational report, which had found that Fontaine's diminished ability to read quickly and accurately affected four core "temperaments" of her job. Dr. Michel criticized Mr. Boyd's inclusion of the temperament "attaining precise limits, tolerances, and standards," as that requirement "does not appear in any description for lawyer occupations." (MET 371.) She criticized Mr. Boyd's testing as "narrow in scope," as it

measured an employee's ability to complete routine, clerical tasks and did not accurately measure the ability of an attorney to perform her occupation.

For example, she stated that the reading comprehension test that Mr. Boyd performed is used to identify superior students who would profit from placement into an advanced or accelerated program. A sample question from the test reads, "A *chef* works with A. bricks B. music C. clothes D. food E. statues." (MET 340-41.) She also criticized the simplistic nature of the clerical tests. She concluded,

> Mr. Boyd's conclusion . . . that vocational testing clearly illustrate[s] and confirm[s] deficits that directly impact Ms. Fontaine's ability to perform the material and substantial duties of her regular occupation as an attorney specializing in Structured Finance is not evident from the testing reviewed. . . . [Mr. Boyd's] conclusion is not supported by the test selection.

(MET 348.)

\*　　\*　　\*

On November 15, 2012, MetLife upheld its decision to deny Fontaine's claim for disability benefits.

## H.  The Social Security Determination

Fontaine applied for Social Security Disability benefits on September 6, 2011. On February 5, 2013, she appeared before an Administrative Law Judge. Fontaine testified that her vision problems caused her to make mistakes at work. She testified that she had double vision and floaters in her right eye. She testified that she would lose words when she read passages and that she would lose her place on a page because she has no depth perception. She testified that her last day of work was April 30, 2011. When asked why some doctors had concluded that Fontaine's eye condition did not limit her ability to work, Fontaine stated,

> There seems to be a lot of confusion about the differences between acuity and full visual function. . . Acuity is can you read an eye chart, . . . but it's different to read an eye chart than it is to read even something like . . . tiny little numbers.

(PLA 270.)  The judge commented, "It is clear to me . . . that you could not do your past work.  I mean there's no question about it . . . ."  (PLA 271.)

Brian Harmon, a court-appointed vocational expert, also testified at the hearing.  The judge asked Mr. Harmon whether there would be any positions in the national or regional economy for someone with Fontaine's condition.  Mr. Harmon stated, "[B]ased upon the way that sedentary jobs are performed, it requires reading, attention to detail.  If somebody were to have severe limitations in perception, they would make – they would make mistakes that would cause them to make errors on work product.  So that would preclude . . . competitive work at the sedentary exertion level."  (PLA 288-89.)

The judge issued an oral decision from the bench.  In issuing her decision, the judge stated:

> I am going to give you benefits. . . . Because of your myopic degeneration, your severe perceptual visual limitations with your being markedly limited in daily living and moderately limited in social functioning, concentration and pace, your residual capacity is probably . . . light . . . .
>
> [Y]our perception issues made for frequent falls and missteps and mismovement. Although you are skilled, your past relevant work has no transferable skills and . . . with [vocational expert] testimony that there would be no position available for you, I do find that you are disabled.

(PLA 289-91.)

## II. ANALYSIS

### A.  Standard of Review

A denial of insurance benefits is reviewed *de novo* under ERISA "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Where the plan gives the administrator discretionary authority, the court applies the

arbitrary and capricious standard of review. *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007).

MetLife's long-term disability plan contains language that would ordinarily be sufficient to trigger a deferential standard of review. (*See* LTD Plan 60 ("[T]he Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."). In 2005, however, the Illinois Department of the Insurance Director ("Director") adopted a regulation providing that:

> No policy, contract, certificate, endorsement, rider application or agreement offered or issued in this State, by a health carrier, to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services or of a disability may contain a provision purporting to reserve discretion to the health carrier to interpret the terms of the contract, or to provide standards of interpretation or review that are inconsistent with the law of this State.

50 Ill. Admin. Code § 2001.3.

MetLife does not dispute that, if Section 2001.3 is valid, then the court should review MetLife's denial of Fontaine's disability claim *de novo*. MetLife argues that Section 2001.3 is *ultra vires* because the "Director is not empowered to enact a statewide ban on discretionary clauses in ERISA plans." (Def.'s Br. 33.) MetLife argues that "Congress empowered the federal judiciary—not state insurance directors—to develop standards of judicial review governing challenges to ERISA benefit decisions" and "Section 2001.3 . . . is *ultra vires* because it attempts to regulate the scope of fiduciary authority that an ERISA plan can grant to a fiduciary under ERISA." (*Id.* at 33-34.) But the Director possesses authority to adopt Section 2001.3 under state law, not federal law. Courts have held that, under state law, the Director's adoption of Section 2001.3 was a valid exercise of his discretion to adopt regulations barring insurance policies that are unfair, inequitable, or contrary to public policy. *Schlattman v. United of Omaha Life Ins.*

*Co.*, No. 12 C 7847, 2013 WL 3147368, at *5 (N.D. Ill. June 19, 2013); *Zuckerman v. United of Omaha Life Ins. Co.*, No. 09 C 04819, 2012 WL 3903780, at *6 (N.D. Ill. Sept. 6, 2012). Thus, MetLife's argument that Section 2001.3 is *ultra vires* fails.

MetLife next argues that Section 2001.3 is preempted by ERISA. ERISA's preemption provision provides that ERISA supersedes all state laws relating to employee benefit plans. 29 U.S.C. § 1114(b)(2)(A). Fontaine argues that Section 2001.3 falls under ERISA's savings clause, which provides:

> Except as provided in subparagraph (b), nothing in this subchapter shall be construed to exempt or relieve any person from law of any State which regulates insurance, banking, or securities.

29 U.S.C. § 1114(b)(2)(A).

"Courts in this District have consistently held that Section 2001.3 falls within ERISA's savings clause, is *not* preempted, and requires *de novo* review." *Zaccone v. Standard Life Ins. Co.*, No. 10 CV 00033, 2013 WL 1849515, at *4 (N.D. Ill. May 1, 2013) (collecting cases); *see also Schlattman*, 2013 WL 3147368, at *5 ("This precise argument [that Section 2001.3 is preempted by ERISA] has been vetted and rejected by two circuit courts of appeal (considering similar regulations) and no less than seven judges within the Northern District of Illinois (considering Section 2001.3 specifically)."). This court agrees that "the well-reasoned opinions in these cases thoroughly evaluate Defendant's preemption argument and persuasively explain why it fails." *Schlattman*, 2013 WL 3147368, at *5.

Finally, MetLife argues that Section 2001.3 precludes disability insurers only from reserving discretionary authority to "interpret the terms of the contract" and does not prohibit ERISA plan administrators from reserving discretionary authority to make benefit determinations. This argument, too, was considered in *Zaccone*. Judge Cole's opinion in *Zaccone* carefully considered the text of Section 2001.3, the Director's intent in adopting the

regulation, and the Illinois Department of Insurance's interpretation of the regulation. 2013 WL 1849515, at *7-11. The court found that the breadth of these sources reflected "an intent to prohibit *any* discretionary clause in an Illinois insurance policy or plan." *Id.* at *7. The court thus held that Section 2001.3 precludes ERISA administrators from reserving discretionary authority to make benefit determinations as well as to interpret the terms of the contract. *Id.* MetLife argues that *Zaccone* was wrongly decided, but this court finds Judge Cole's reasoning persuasive.

The standard of review is therefore *de novo*. "[T]he *de novo* standard requires the Court to review the case with a fresh eye. In fact, the Court is not technically 'reviewing' any decision, but rather making its own independent determination about the merits of the dispute and the employee's entitlement to benefits." *Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 889 (N.D. Ill. 2009) (quoting *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007)), *aff'd*, 615 F.3d 808 (7th Cir. 2010). Fontaine bears the burden of proving, by a preponderance of the evidence, that she is entitled to benefits under the MetLife policies. *Ball v. Standard Ins. Co.*, No. 09 C 3668, 2012 WL 2115484, at *2 (N.D. Ill. June 7, 2012) (citing *Ruttenburg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005)).

## B. Whether Fontaine is Entitled to Benefits

As an initial matter, the parties dispute whether Fontaine must prove that she was unable to perform "all" of her material job responsibilities or merely "one" of her material job responsibilities to recover benefits under the long-term disability policy. That policy provides that Fontaine is entitled to benefits if she is "unable to perform each of the material duties of . . . the specialty in the practice of law in which [she was] practicing." (LTD Policy 22.) To support her interpretation of the policy, Fontaine relies on *McFarland v. General American Life*

*Insurance Company*, 149 F.3d 583 (7th Cir. 1998). In *McFarland*, the Seventh Circuit found that the policy language at issue could be interpreted reasonably to cover "qualitative reductions"—disabilities affecting one core and essential aspect of a person's job, even if that aspect comprised only a small percentage of the person's overall duties. *Id.* at 588. But the policy in *McFarland* defined disability as the inability to perform "the material and substantial duties of your regular occupation." *Id.* at 585. The policy here defines disability as the inability to perform "*each* of the material duties of your own occupation." (LTD Policy 22 (emphasis added).) The court agrees with MetLife that this difference is significant and that *McFarland* is inapplicable. Fontaine must show that she is unable to perform *all* of the material duties of a structured finance partner.

In considering whether Fontaine has met that standard, the court turns first to the medical evidence, trying to understand, as best it can, what it is like to see with Fontaine's eyes. It is undisputed that Fontaine was diagnosed with myopic retinal degeneration of both eyes in 1997. Because myopic degeneration is a progressive disease, Fontaine's vision was likely to deteriorate over time. Fontaine returned to her doctors many times over the years, complaining of floaters, flashes, difficulty focusing, migraine headaches, blurred vision, double vision, and bursting blood vessels. Fontaine had no reason to lie about these symptoms, and MetLife has offered no evidence to dispute them.

The evidence also demonstrates that Fontaine has at least one scotoma, or blind spot, in her right eye. Dr. Zost administered a visual field test and concluded that the results "confirmed central relative scotomas consistent with macular degeneration."[6] (MET 450.) MetLife's own

_____

[6]    Once again, a "relative scotoma" is a scotoma in which there is a visual depression but not a complete loss of light perception, as opposed to an "absolute scotoma," in which there is no perception of light.

expert, Dr. Eliot, also noted that because Fontaine had lacquer cracks and pigment changes, she likely had a few small scotomas. MetLife argues that the results of Dr. Zost's visual field test results do not establish that Fontaine has any scotomas. To support its argument, MetLife relies on Dr. Anderson, who reviewed the visual field test results and concluded that they did not show that Fontaine had any *absolute* scotomas in her right eye. But Dr. Anderson acknowledged that there was one spot of depression in Fontaine's right eye that, while not indicative of an absolute scotoma, still suggested "a region of slightly decreased light perception." (MET 204.) Dr. Anderson's report is thus consistent with Fontaine having at least one relative scotoma in her right eye.[7]

The court next considers whether Fontaine's symptoms prevented her from being able to perform each of her material job duties. As Fontaine explained, those duties included reading volumes of dense, technical material presented in multiple mediums and proofreading the work of others. They included analyzing complex fact patterns to evaluate risk. They included meeting with clients to generate new business. Fontaine was required to perform these duties under intense time pressures in a context leaving her no margin of error. She typically worked twelve hours per day with additional work on the weekends. MetLife offers no evidence suggesting that Fontaine's characterization of her job duties is inaccurate, and the court sees no reason to doubt Fontaine's testimony on this issue.

MetLife's principal argument is that Fontaine was able to perform these duties because of her good visual acuity. The court disagrees. Fontaine has never suggested that she was disabled because of poor visual acuity. As MetLife's field representative reported, "[Fontaine] is not

---

[7] Fontaine submits that she also has scotomas in her left eye, but she cites only the raw data without any expert interpretation of the data. (*See* Pl.'s Resp. to Def.'s Statement of Facts ¶ 61 (citing MET 2053).) Because the court cannot interpret the data without the aid of expert testimony, it cannot conclude definitively that Fontaine has scotomas in her left eye.

saying that she cannot read and cannot see; she is saying that she cannot see and read well enough to perform her occupation." (MET 621.) Visual acuity is a measure of a person's ability to read individual letters on an eye chart at a distance. As Fontaine's doctors noted, an attorney could have excellent visual acuity yet still be unable to perform the difficult tasks that Fontaine was required to perform.

MetLife also relies heavily on Dr. Nelson's conclusion that Fontaine is visually capable of performing her job. Dr. Nelson's objectivity, however, is questionable at best; his report reads more like a work of advocacy than a dispassionate analysis. (*See, e.g.*, MET 907 (suggesting that "anxiety" or "burn out" contributed to Fontaine's "insecurity" in her job and concluding "definitively" that her impairments should not affect her ability to generate new business).) Dr. Nelson has no expertise in psychiatry and is wholly unqualified to offer an opinion that Fontaine was suffering from anxiety or burn out. It is troubling that MetLife would rely on such a wildly speculative opinion.

MetLife also relies on Dr. Hauser's opinion that "there is no medical basis for [Fontaine] to be unable to continue performing the work she has done over the years." (MET 397.) Dr. Hauser based this conclusion solely on his review of the administrative record; he never met with Fontaine. Dr. Hauser reasoned that "[t]he best assessment of [Fontaine's] visual acuity is her job performance" and, because her job performance was stellar from 2008 through 2010, her medical condition could not have worsened during that period of time. (MET 397.) As the Seventh Circuit has noted, this argument "would be correct were there a logical incompatibility between working full time and being disabled from working full time, but there is not. A desperate person might force himself to work despite an illness that everyone agreed was totally disabling." *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th

Cir. 2003). Moreover, Dr. Hauser is a family practitioner; he has no special training rendering him qualified to opine on what Fontaine's job performance indicates about her visual acuity. The court finds his conclusion irrelevant.

By contrast, Fontaine's treating physicians, Drs. Stein and Karikomi, appear to be credible. Drs. Stein and Karikomi had the benefit of seeing Fontaine as their patient for a number of years. They had an opportunity to hear Fontaine describe her symptoms and her work responsibilities in person. While the court is mindful that "physicians naturally tend to support their patients' disability claims," *id.* at 917, the court sees no evidence of bias in this case. Unlike the reports of many of MetLife's experts, Fontaine's treating physicians restricted their conclusions to her eye conditions and how they might affect her ability to do her job. They agreed that by 2011, Fontaine's eye disease had progressed to the point where she was unable to read at the level that is required of a structured finance partner. The weight of the testimony from these doctors, then, supports a finding that Fontaine was disabled.

The record also supports crediting Fontaine's own testimony. The administrative law judge found Fontaine credible and determined that she was unable to perform *any* job in the national or regional economy. (PLA 299-89.) Fontaine's professional accomplishments further support her credibility. The letters from her colleagues demonstrate that she was a leader in her field and one of the most highly respected and hardest working partners at her firm. In reviewing her claim statement, the summary of her interview with the MetLife field representative, and her sworn testimony before the Social Security Administration, the court detects no hint of malingering. To the contrary, the record suggests that Fontaine genuinely loved her work and would have continued to work were it not for her disability.

Having considered the evidence submitted by the parties, the court finds that Fontaine has shown by a preponderance of the evidence that she is unable to perform each of the material and substantial duties of her job. Accordingly, she is entitled to benefits under both MetLife policies.

## C. Remedy

Fontaine seeks the past benefits due to her since October 28, 2011, in the amount of $33,500 per month (plus any accrued cost-of-living adjustments), less $2,444 per month, representing the amount of Social Security disability benefits she was awarded in October 2011 (but excluding the attorney's fees she incurred as part of those proceedings). She maintains that both MetLife policies provide for a 3% cost of living adjustment. She seeks prejudgment interest at the rate of 9%, attorneys' fees and costs, and a declaratory judgment that she is entitled to continued payments so long as she meets the policy terms and conditions of receipt of those benefits.

MetLife disputes three aspects of the remedy. First, it disputes Fontaine's statement that the long-term disability policy provides for a 3% cost of living adjustment. (Def.'s Resp. to Pl.'s Statement of Facts ¶ 14.) MetLife does not explain why it disputes this fact. The long-term disability policy states, "To calculate Your cost of living adjustment, We will multiply the amount of Your Monthly Benefit for the month prior to the date of the cost of living adjustment is to take effect by 3%." (LTD Policy 41.) The court finds that Fontaine is entitled to a cost of living adjustment under this policy.

Second, MetLife disputes the amount of offset income. It contends that under the long-term disability plan, benefits are to be reduced by "any income received for disability or retirement under the Policyholder's Retirement Plan, to the extent it can be attributed to the Policyholder's contribution." (MET 1921.) "Policyholder's Retirement Plan" is defined as "a

plan which . . . provides retirement benefits to employees . . . and is funded in whole or in part by Policyholder contributions." (MET 1906.) MetLife contends that Fontaine's benefits should be reduced by her pension, which it argues is income received for retirement under her Retirement Plan.

Fontaine notes that the long-term disability plan was amended, retroactive to November 15, 2010, to exclude "unfunded plans" from the definition of a "Policyholder Retirement Plan." Fontaine argues that because her claim did not arise until 2011, it is governed by the revised policy. She argues that her benefits are paid under an unfunded plan and are therefore not subject to offset.

If Fontaine is correct that her benefits are paid under an unfunded plan, then it would appear that her benefits should not be reduced by her pension. MetLife did not respond to this argument in its reply brief, but its failure to do so is excusable given the number of other issues that MetLife needed to address. Based on Fontaine's representation that her benefits are paid under an unfunded plan, the court finds that Fontaine's disability benefits should not be reduced by her pension. If, however, MetLife disagrees with Fontaine's representation, it may file a motion for reconsideration on this issue.

Finally, the court must decide whether to award attorneys' fees. Section 1132(g)(1) of Title 29 provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In *Hardt v. Reliance Standard Life Insurance Co.*, the Supreme Court interpreted ERISA's fee shifting provision, holding that a court may award fees to an ERISA litigant if she has achieved "some degree of success on the merits." 560 U.S. 242, 254 (2010). This ruling supplanted this circuit's "prevailing party" standard for

awarding fees in ERISA cases. *Id.*; *see also Hakim v. Accenture U.S. Pension Plan*, 901 F. Supp. 2d 1045, 1051 (N.D. Ill. 2012).

Because Fontaine achieved "some degree of success on the merits," the court may exercise its discretion to award attorneys' fees. The Seventh Circuit has recognized that a court's discretion should be guided by the question, "[W]as the losing party's position substantially justified and taken in good faith, or was the party simply out to harass the opponent?" *See Stark v. PPM Am., Inc.*, 354 F.3d 666, 673 (7th Cir. 2004). "Substantially justified" means "something more than nonfrivolous, but something less than meritorious—and taken in good faith, or if special circumstances make an award unjust." *Herman v. Central States, S.E. and S.W. Areas Pension Fund,* 423 F.3d 684, 696 (7th Cir. 2005).

The court gave serious consideration to awarding fees in this case. Judge Dow ordered MetLife to pay attorneys' fees in a case involving similar allegations, where the Seventh Circuit had found that MetLife's denial of a claim was arbitrary and capricious. *Holmstrom v. Metro. Life Ins., Co.*, No. 07-CV-6044, 2011 WL 2149353, at *3 (N.D. Ill. May 31, 2011). As noted previously, the court found many of MetLife's justifications for its denial troubling, especially its reliance on Dr. Hauser's report. MetLife's position also demonstrated a failure to appreciate the demands of Fontaine's job responsibilities.

Ultimately, however, the court cannot find that MetLife's position was not "substantially justified." Essentially, MetLife has argued that, while Fontaine submitted *some* evidence that she was disabled, she simply did not provide *enough* evidence. While the court disagrees with MetLife's conclusion, it was not an entirely frivolous argument. Accordingly, the court denies Fontaine's request for attorneys' fees.

### III. CONCLUSION

For the foregoing reasons, the court grants Fontaine's motion for entry of judgment and denies MetLife's motion. The clerk is directed to enter judgment in favor of Fontaine and to terminate this case.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:  March 27, 2014